## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MSP RECOVERY CLAIMS SERIES 44, LLC, a Delaware entity,<br><br>  Plaintiff,<br><br>v.<br><br>IDS PROPERTY CASUALTY INSURANCE COMPANY,<br><br>  Defendant. | Case No.:  22-cv-1238<br><br>COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT

Plaintiff, MSP Recovery Claims Series 44, LLC ("MSPRC 44" or "Plaintiff"), a Delaware entity, on behalf of its Designated Series, brings this action against IDS Property Casualty Insurance Company ("IDS" or "Defendant") and alleges:

## INTRODUCTION

1.      More than forty years ago, Congress passed the Medicare Secondary Payer Act (the "Act" or "MSP Act") to deal with ballooning medical entitlement costs, by transforming Medicare from the entity that always foots the bill, into a safety net for the medical expenses of beneficiaries who also were covered by private plans and insurers such as IDS.

2.      Six years later, Congress recognized that it needed to do more to make this transformation effective and amended the MSP Act to add a private cause of action so persons and private entities could recover secondary payments made by Medicare (and later, by Medicare

Advantage Organizations ("MAOs"))[1] that private plans and insurers had failed to reimburse. Congress provided for double damages, so that private litigants would be motivated to take arms against a recalcitrant insurer.

3.      In 1997, Congress created the "Medicare Advantage" option under Part C of Medicare, 42 U.S.C. § 1395w-21(a)(1)(B), with the hope that Medicare Advantage would eclipse traditional Medicare. Under Medicare Advantage, Medicare enrollees receive their Medicare benefits from private health insurers known as MAOs. Today, nearly 40% of all Medicare beneficiaries receive their benefits under a Medicare Advantage Plan.

4.      Even though it is settled law that MAOs have parity of recovery rights, auto insurers have disregarded for more than a decade their repayment obligations to MAOs. That failure improperly depletes the trust funds that support Medicare Advantage, which are the same trust funds that support Medicare Parts A and B. *See* 42 U.S.C. § 1395w-23(f). Accordingly, Congress' mandate that Medicare shall not be the entity that always foots the bill is still a long way from being implemented. This case seeks to reconcile, in a structured and fair way, claims for reimbursement that IDS owes to MAOs that assigned their rights to MSPRC 44, which will more effectively implement Congress' original intent in passing the MSP Act.

## IDS'S DUTIES TO MEDICARE AND MAOS

5.      IDS is a property and casualty insurer that is in the business of collecting premiums in exchange for taking on the risk that its insureds will be injured, and IDS will be contractually

---

[1] MAOs include Medicare Service Organizations, Independent Physician Associations, and other first tier and downstream entities (collectively, "MAOs"). As the Eleventh Circuit has explained, "some MAOs contract with smaller organizations, like independent physician associations, that have closer connections to local healthcare providers. These smaller organizations, or 'downstream' actors, are also a part of the Medicare Advantage system . . . ." *MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co.*, 974 F.3d 1305, 1308 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 2758 (2021).

obligated to pay for its insured's accident-related medical care. IDS also collects premiums in exchange for taking on the risk that its insureds will injure someone else, and IDS will be required to indemnify its insureds, typically through a settlement agreement that releases the third-party claimant's claim for accident-related medical care.

6.     Under both circumstances, IDS falls within the MSP Act's definition of a "primary plan," which includes "an automobile or liability insurance policy or plan (including a self-insured plan) or no-fault insurance." 42 U.S.C. § 1395y(b)(2)(A). As a primary plan, IDS is charged with two duties under the Act: (1) to notify the secondary payer (whether it be Medicare or an MAO) of IDS's primary payer status, and (2) to repay the secondary payer within 60 days. 42 U.S.C. §§ 1395y(b)(2)(B)(ii), 1395w-22(a)(4).

7.     If IDS is rendered a primary plan and fails to repay the Medicare lien within 60 days, the MSP Act automatically gives rise to a right to bring an action such as this one. Failure to reimburse Medicare or MAOs for accident-related medical payments effectively results in a windfall for IDS, to the detriment of the Medicare trust funds and taxpayers.

## PARTIES, JURISDICTION, AND VENUE

8.     MSPRC 44 is a Delaware series limited liability company with a principal place of business located at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134.

9.     MSPRC 44 is a Series LLC. Under Delaware law, a Series LLC operates similarly to, but not the same as, a corporation and its subsidiaries. MSPRC 44 is the master LLC. Each individual Series entity forms a part of MSPRC 44, and MSPRC 44 owns and controls each individual Designated Series entity.

10.     MSPRC 44 established various Designated Series pursuant to Delaware law in order to maintain various claims recovery assignments separate from other company assets, and to

account for and associate certain assets with certain series. All Designated Series form a part of MSPRC 44, and pursuant to MSPRC 44's limited liability agreement and applicable amendment(s), each designated series is owned and controlled by MSPRC 44.

11.     Unlike a traditional corporate subsidiary and parent relationship, a series need not be a separate legal entity. As one commentator has explained, "[a] series LLC authorizes an extraordinary type of membership interest—one that neither pertains to nor partakes of an entire LLC but rather is associated with and segregated to a compartmentalized set of assets, profits, losses, and liabilities. An LLC statute that authorizes series LLCs permits an LLC to compartmentalize its operations and create 'internal' shields to protect assets associated with one aspect of the business from claims pertaining to others. Under a series provision, an LLC may associate specified assets and operations with a particular series of membership interests and limit claims and obligations pertaining to those interests and operations to the specified assets." Daniel S. Kleinberger, Carter G. Bishop, *The Next Generation: The Revised Uniform Limited Liability Company Act*, 62 Bus. Law. 515, 541 (2007) (internal citation and quotation marks omitted) (alteration adopted).

12.     Thus, MSPRC 44 may either (1) receive assignments directly to it from third party MAOs in the name of MSPRC 44 and further associate such assignments with a particular Series, or (2) may have an MAO's claims assigned directly to a particular Designated Series. In either event, MSPRC 44's agreements with its Designated Series give it the right to sue on behalf of each Designated Series and pursue any and all rights, benefits, and causes of action arising from assignments to a Designated Series by way of its limited liability agreement. MSPRC 44's right to sue on behalf of its Designated Series is reinforced by the "Certificate of Designation" that creates the Designated Series and specifically states that MSPRC 44 may sue on its behalf.

13.     As permitted under Delaware law, MSPRC 44's limited liability agreement vests in the master LLC the right to initiate and maintain legal proceedings on behalf of its Designated Series entities individually or collectively. Any claim or suit may be brought by MSPRC 44 in its own name, or in the name of its Designated Series, individually or collectively.

14.     MSPRC 44 specifically alleges it possesses valid assignments to bring actions for seeking redress for all claims described herein.

15.     MSPRC Series 44-20-583 is a Designated Series entity of MSPRC 44 with its principal place of business at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134. Series 44-20-583's Certificate of Designation, dated October 22, 2020, provides that MSPRC 44 may assert all of the same rights as Series 44-20-583 and may sue on Series 44-20-583's behalf: "[Series 44-20-583] continues as a separate designated series of [MSPRC 44] under the LLC Act and the LLC Agreement. For avoidance of doubt, (i) any and all rights, benefits, and causes of action arising from assignments of claims to [Series 44-20-583] form part of [MSPRC 44's] assets, (ii) [MSPRC 44] has the right and authority to seek reimbursement of Medicare payments in respect of any such assigned claims, whether in the name of [Series 44-20-583] or [MSPRC 44] , and (iii) [MSPRC 44] maintains the legal right to sue on behalf of [Series 44-20-583]. Any claim or suit capable of being asserted or brought by [Series 44-20-583] may be brought by [MSPRC 44] (on behalf of itself or in the name of [Series 44-20-583])."

16.     MSPRC 44 made a good faith effort to accurately identify IDS in this Complaint, in reliance on information obtained from IDS's website, any police crash reports, and an independent vendor, MyAbility, which is part of Ability Network. MyAbility allows companies, such as MSPRC 44, to access data that primary payers report to the Centers for Medicare & Medicaid Services ("CMS"), pursuant to Section 111 of the Medicare Medicaid and SCHIP

5

Extension Act of 2007. Reporting data attached as **Exhibit A** to this Complaint is taken directly from data inputted by IDS to CMS, either directly or through its vendor (such as Insurance Services Office ("ISO")). Accordingly, any inaccuracy or lack of specificity in the data is attributable to IDS.

17.     Any time IDS receives a claim for accident-related insurance benefits, the MSP Act requires IDS to "determine whether the claimant . . . is entitled to [Medicare] benefits[.]" 42 U.S.C. § 1395y(b)(8)(A)(i). If that claimant is indeed a Medicare-eligible beneficiary, IDS must then provide a Section 111 to CMS at a time "after the claim is resolved [by IDS] through a settlement, judgment, award, or other payment (regardless of whether or not there is a determination or admission of liability)." 42 U.S.C. § 1395y(b)(8)(A)(ii). Therefore, when IDS makes a Section 111 report to CMS, it is admitting it made a "payment" to a Medicare-eligible beneficiary, and that the purpose of IDS's payment was to "resolve" the beneficiary's accident-related claim for medical benefits.

18.     By making such a payment, as admitted in its Section 111 report, IDS demonstrates it is the "primary plan," which means IDS must reimburse Medicare for any conditional payments Medicare made that relate to the beneficiary's accident.  Under the MSP Act, "a primary plan must reimburse Medicare for [its] conditional payments 'if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service.' . . . A primary plan's responsibility for payment may be shown by: a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured . . . ." *MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1299 (11th Cir. 2022) (citing 42 U.S.C. § 1395y(b)(2)(B)(ii)).

19.     Given this statutory framework, MSPRC 44 may justifiably rely on IDS's reporting to identify IDS as the primary plan for the beneficiaries at issue in this case.

20.     IDS is an insurer who issues liability and no-fault policies and is incorporated in the state of Wisconsin. IDS's principal place of business is at 3500 Packerland Drive, De Pere, Wisconsin 54115.

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 (b), (c), and (d) because at all times material hereto, IDS resided, transacted business, was found, or had agents in this District, and a substantial portion of the alleged activity affecting trade and commerce discussed below has been carried out in this District.

23.     This Court has personal jurisdiction over IDS because it is at home in this forum, and personal jurisdiction over IDS does not offend traditional notions of fair play and substantial justice.

## STANDING ALLEGATIONS

24.     MSPRC 44 uncovers MSP Act noncompliance through data analytics, which requires cross-referencing unreimbursed, accident-related conditional payments in listed assignors' claims data with instances where insurers reported to CMS under Section 111 that they were responsible for the accidents. These Section 111 reports make the insurers primary payers under the MSP Act as a matter of law. While MSPRC 44 has no direct access to the Section 111 reporting, MSPRC 44 obtains reports from a subscription service that contracts with CMS and provides to subscribers what primary payers report to CMS.

25.     While this cross-referencing exercise may be successful in identifying some

7

unreimbursed conditional payments, the bulk of those payments remain hidden without discovery. This is so because auto insurers either failed to report all their claims pursuant to Section 111 (which until this year, resulted in no penalty) or withdrew their reports prior to detection by an MAO. The only way to fully identify all secondary payments that auto insurers failed to reimburse is by comparing an MAO's and an auto insurer's claims data.

26.     For the above reasons, the accurate and complete amount of MSPRC 44's damages cannot be known until after IDS has produced lists of no-fault and third-party claims that it settled. Accordingly, and solely for the purpose of demonstrating standing to pursue claims against IDS, and to obtain the discovery MSPRC 44 needs, the following example of IDS's failures to reimburse and comply with the MSP Act are alleged *infra*.

27.     MSPRC 44 sets forth below allegations related to a representative beneficiary to illustrate IDS's failure to fulfill its statutory duties to reimburse MSPRC 44's assignor for conditional payments. IDS has these statutory duties: (i) as a direct "no-fault" and/or other liability insurer; and (ii) when entering into settlements on behalf of tortfeasors who are sued by Medicare beneficiaries. In both sets of circumstances, IDS reported and admitted its primary payer status and responsibility for the accident-related expenses for medical items and/or services provided to beneficiaries for which HEAL (as defined below) made conditional payments.

## Assignment Allegations

28.     MSPRC 44's claims in this lawsuit stem from its assignment agreements with Health Alliance Medical Plans, Inc. ("HEAL").  On March 19, 2019, HEAL irrevocably assigned all its rights and claims to recovery against any liable entity (including defendants) for payments made on behalf of its Enrollees pursuant to Medicare law to MSP Recovery, LLC. Specifically, the HEAL Assignment states the following:

[HEAL] assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [HEAL's] right, title, ownership and interest in and to (i) all Claims existing on the date hereof, whether based in contract, tort, statutory right, and all related recovery rights arising from the health care claims data transferred to MSP Recovery, and (ii) any and all causes of action and legal or equitable rights (including, but not limited to, subrogation) to pursue and/or recover monies related to the Claims that [HEAL] had, may have had, or has asserted against any party in connection with the Claims and (iii) all causes of action and rights and claims, legal or equitable, against primary payers, Responsible Parties and/or third parties that may be liable to [HEAL] arising from or relating to the Claims, including claims under consumer protection statutes and laws (all of the Claims and rights set forth in (i)-(iii), the "Assigned Claims").

HEAL Assignment, at 1.1.1. In addition, the assignment provides:

The act of transferring any claims data by [HEAL] to MSP Recovery in accordance with section 2.1 below constitutes Client's affirmative election to assign, and to continue to assign, to MSP Recovery all causes of action and Claims reimbursement and recovery rights arising from said transferred data and shall constitute the grant, assignment and conveyance of all right, title and Interest in and to the Claims identified or arising from the Client's transferred data and shall constitute Assigned Claims.

In accordance with this express provision, HEAL has repeatedly made further data transfers and has assigned new claims to MSPRC 44 (as the assignee of MSP Recovery, LLC). The date of the most recent data transfer assignment was January 29, 2020. The claims that HEAL has assigned via subsequent data transfer include claims for dates of service that extend beyond March 19, 2019.

29.    On April 10, 2019, MSP Recovery, LLC irrevocably assigned all rights acquired under the HEAL Assignment to Series 17-03-583, a designated series of Plaintiff MSP Recovery Claims, Series LLC:

The Assignor hereby irrevocably assigns, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively, the "Assigned Claims") as such terms are defined in the Recovery Agreement.

Series Assignment, at 1.

30.     Further, on October 22, 2020, Series 17-03-583 entered into an assignment agreement with Series 44-20-583, a designated series of Series 44, whereby it irrevocably assigned all rights it acquired through its assignment agreement with MSP Recovery, LLC. This third assignment agreement was executed by individuals of majority, of sound mind, and with legal authority to bind the respective parties, and was entered into under Florida law:

> [Series 17-03-583] . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-583] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to that Agreement, as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreement.

> This Assignment includes all the Assigned Claims irrespective of when the claims were vested in HEAL, inclusive of any and all claim(s), causes of actions, proceeds, products, and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to HEAL arising from or relating to the Claims and all information relating thereto.

Series Assignment, at 1.

31.     Consideration was given between each party in executing these assignments.

32.     This Complaint seeks recovery only for claims HEAL assigned to MSPRC 44, through its Designated Series (Series 44-20-583). All claims at issue in this Complaint, and all claims data currently in MSPRC 44's possession, were assigned to MSPRC 44, either through the original HEAL Assignment or a later data transfer. Indeed, MSPRC 44 is only in possession of the claims data for each beneficiary identified in this lawsuit because HEAL provided that data to MSPRC 44 as part of the aforementioned assignments. At the time of each assignment, HEAL was the sole owner of each claim it assigned to MSPRC 44, as stated in the written assignment agreement.

## The No-Fault Claim Representative Beneficiary

33.    Pursuant to 42 C.F.R. § 411. 24(f)(1), Medicare "may recover without regard to any claims filing requirements that the insurance program or plan imposes on the beneficiary or other claimant such as a time limit for filing a claim or a time limit for notifying the plan or program about the need for or receipt of services." IDS failed to provide actual notice of the existence of either its no-fault policies, its self-executing contractual obligation for the beneficiaries' medical expenses, or its responsibility for reimbursement to MSPRC 44's assignor who is a MAO that paid for the beneficiaries' medical expenses.

34.    In the same vein, IDS may not rely on state law to shirk their federal statutory reimbursement obligations to Medicare and their federal regulatory obligation to provide notice to the Medicare Participant(s) that paid for medical expenses covered by their insurance policies. 42 C.F.R §§ 411. 24(f)(2), 422.108(f), and 422.402.

## J.M.

35.    On October 20, 2018, J.M. was enrolled in a Medicare Advantage Plan issued by Health Alliance Medical Plans, Inc. ("HEAL"), an MAO and MSPRC 44's Designated Series assignor in this action.

36.    On October 20, 2018, J.M. was injured in an accident. As a direct and proximate result of the accident, J.M. sustained injuries that required medical items and services.

37.    At the time of the accident, J.M.'s accident-related medical costs and expenses were covered under a no-fault policy issued by IDS under policy number AI01731184. By virtue of its no-fault policy, IDS was contractually obligated to pay and provide primary coverage for J.M.'s accident-related medical expenses.

38.    A list of J.M.'s diagnosis codes and injuries in connection with J.M.'s accident-

related treatment is attached hereto as **Exhibit B**. The codes used are standard medical industry codes, which correspond to specific treatments and procedures. These codes are well known to IDS and can be found through a simple Internet search. For further information on the format of this claims data, *see* Appendix.

39. J.M.'s accident-related medical services were rendered on October 20, 2018, and October 26, 2018. The medical providers subsequently issued bills for payment of J.M.'s accident-related medical expenses to HEAL. The medical providers billed and charged HEAL $456.88 for J.M.'s accident-related medical expenses, of which HEAL paid $189.78 (*see* **Exhibit B**). At the time HEAL executed its assignment agreement in favor of Series 44-20-583, HEAL's right to seek reimbursement for J.M.'s accident-related treatment was never assigned to and/or pursued by other recovery vendors. HEAL held all recovery rights to J.M.'s accident-related treatment and conveyed them to MSPRC 44. HEAL did not retain the recovery right to J.M.'s claim.

40. By virtue of its no-fault policy which covered J.M., IDS is a primary payer responsible for payment and/or reimbursement of J.M.'s accident-related medical expenses.

41. In fact, IDS issued a Section 111 report to CMS regarding the accident, the name of the reporting entity, and the type of insurance policy involved, and admitted its primary payer status related to payment and/or reimbursement of J.M.'s accident-related medical expenses (*see* **Exhibit A**).

42. This reporting demonstrates IDS was aware of its responsibility to reimburse HEAL.

43. Despite reporting it was a primary payer, and the corresponding admission it should have paid for J.M.'s accident-related injuries, IDS failed to remit and/or reimburse such payments.

44. IDS was aware of its MSP Act responsibility to reimburse conditional payments advanced for medical services rendered to J.M. IDS was also aware of its 42 C.F.R 411.24(f)(2)

duty to notify the Medicare carrier that paid for J.M.'s medical expenses, in this instance HEAL. IDS did not notify HEAL of its primary responsibility to pay for J.M.'s medical expenses.

45.     In the time since the incident, IDS has enjoyed the use of HEAL's funds to the detriment of the Medicare system. MSPRC 44 has sent a 42 C.F.R. § 411.25 demand letter to IDS months before filing this Complaint. As of the date of filing this Complaint, IDS has not provided a response.

46.     MSPRC 44 expended a great deal of effort and resources to uncover IDS's failures in the handling of J.M.'s claims and the unjust enrichment IDS has benefitted from during this period of noncompliance. As HEAL's assignee, MSPRC 44 instituted this action to recover the debt.

47.     Accordingly, MSPRC 44 is entitled to collect double damages against IDS for its failure to reimburse HEAL's conditional payment for J.M.'s accident-related medical expenses.

## The Settlement Claims

48.     In exchange for premiums, IDS may take on the risk of loss and accident-related medical expenses incurred by third parties who suffered an injury induced by either its customers and/or their covered property. When these instances arise, IDS executes a settlement agreement on behalf of its insured with the covered persons.

49.     When IDS executes a settlement agreement with a covered person, who is enrolled in a Medicare plan, IDS becomes a primary payer that is responsible for the reimbursement of the medical services rendered to the covered person. IDS's duty to reimburse conditional payments made by Medicare Participants for the health services rendered is nondelegable. IDS may not transfer its responsibility for reimbursement to covered persons or other third parties.

50.     After executing settlement agreements in each instance identified below, IDS failed to provide actual notice of its primary payer status to the Medicare participants who paid for the

beneficiaries' medical expenses. IDS may not rely on state law to shirk its federal statutory reimbursement obligations to the Medicare system. IDS may not sit, wait, derelict its federal affirmative duties and then invoke absolution under state law.

## COUNT I

### Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A)
### (as to HEAL's unreimbursed payments)

51.    MSPRC 44 re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-50 as if fully set forth herein.

52.    MSPRC 44 asserts a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

53.    IDS's no-fault and liability policies are primary plans, which rendered IDS the primary payer for its insureds' accident-related medical expenses.

54.    As part of providing Medicare benefits under the Medicare Advantage program, HEAL paid for items and services which were also covered by no-fault, personal injury protection, or medical payments policies issued by IDS.

55.    IDS also entered into settlements with beneficiaries, relating to accidents but failed to reimburse HEAL for accident-related medical expenses paid by HEAL. As a primary payer, IDS had a nondelegable duty to reimburse conditional payments advanced by Medicare participants for medical services rendered to beneficiaries. IDS is liable for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

56.    IDS was required to timely reimburse HEAL for conditional payments made on behalf of beneficiaries' accident-related medical expenses. HEAL has assigned that claim to MSPRC 44.

57.     HEAL (and thus, MSPRC 44) suffered damages as a direct result of IDS's failure to comply with its statutory and regulatory duties under the MSP Act and the corresponding regulations within the Code of Federal Regulations.

58.     IDS derived substantial monetary benefit by placing the burden of financing medical treatments on HEAL, which has assigned the relevant claims to MSPRC 44.

59.     IDS failed to administratively appeal HEAL's rights to reimbursement within the administrative remedies period. IDS, therefore, is time-barred from challenging the propriety, reasonableness and necessity of the amounts paid.

60.     MSPRC 44 only seeks to recoup accident-related medical services rendered to beneficiaries.

61.     MSPRC 44 brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), to recover double damages from IDS for its failure to make appropriate and timely reimbursement of conditional payments for beneficiaries' accident-related medical expenses.

## COUNT II

### Declaratory Relief Pursuant to 28 U.S.C.
### § 2201 (as to HEAL's unreimbursed payments)

62.     MSPRC 44 re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-50 as if fully set forth herein.

63.     MSPRC 44 alleges that as part of providing Medicare benefits under the Medicare Advantage program, HEAL paid for items and services which were also covered by no-fault, personal injury protection, or medical payments policies issued by IDS.

64.     IDS entered into settlements with beneficiaries relating to accidents but failed to reimburse HEAL for accident-related medical expenses paid by HEAL. As a primary payer, IDS had a nondelegable duty to reimburse conditional payments advanced by Medicare participants for

accident-related medical services rendered to covered persons. IDS is liable for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

65. IDS was required to timely reimburse HEAL for conditional payments made on behalf of beneficiaries' accident-related medical expenses.

66. An actual, present, and justiciable controversy has arisen between MSPRC 44 and IDS concerning its obligation to reimburse HEAL.

67. MSPRC 44 seeks a declaratory judgment from this Court establishing that IDS has a historical, present, and continuing duty to reimburse HEAL for payments made on behalf of beneficiaries' accident-related medical expenses. MSPRC 44 also seeks a declaration of what amounts are due and owing by IDS to HEAL.

68. A determination of what amounts are owed by IDS to HEAL is complicated and difficult.

69. Under Wisconsin law, one of several conditions must exist for an equitable accounting: there must either be a fiduciary or trust relationship, the existence of complicated accounts, or a need of discovery.

70. A coordination of benefits process requires plans to share information between the primary payer and secondary plan and to act in good faith.

71. The Code of Federal Regulations defines the coordination of benefits system as a "coordination of benefits transaction."[2]

---

[2] The "coordination of benefits transaction" is the transmission of claims data from any entity to a health plan for the purpose of determining the relative payment responsibilities of the health plan, of either of the following for health care: (a) claims and (b) payment information. 45 C.F.R. § 162.1801.

72.     The coordination of benefits transaction involves the exchange of thousands of claims data and data points between the parties to determine overlapping instances where HEAL made payment of medical items and services on behalf of a Medicare beneficiary who was entitled to the benefit of insurance coverage provided by IDS. This includes not only instances in which a Medicare beneficiary was directly insured by IDS, but also instances in which a Medicare beneficiary was injured by IDS's policyholder.

73.     The exchange of claims data would need to be done by extracting and producing certain data fields from IDS's and MSPRC 44's databases by using demographic identifiers, such as Social Security Number ("SSN"), Health Insurance Claim Number ("HICN"),[3] date of birth, sex, and address. Beneficiary matching pinpoints the number of relevant insureds and simplifies the process of identifying reimbursable claims, which is done by matching the date of loss (for IDS), with dates of payment (for MSPRC 44), and then discovering what IDS reimbursed (if anything), and to whom.

74.     The data MSPRC 44 requests from IDS to perform an accounting is information MSPRC 44 is already entitled to without litigation. 42 C.F.R. § 411.25(a); 59 Fed. Reg. 4285.

75.     Given the size of the claims and data points being exchanged between the parties, the coordination of benefits transaction is complex.

76.     An equitable accounting of the amounts owed MSPRC 44 by IDS is proper because the facts and accounts presented are so complex that adequate relief may not be obtained at law.

77.     MSPRC 44 is entitled to an accounting of all instances where IDS settled a tort claim under a third-party insurance policy or accepted coverage under a first party insurance

---

[3] Also known as a Medicare Beneficiary Identifier ("MBI").

policy. This accounting should include, at a minimum, the identity of each claimant for whose benefit HEAL provided or paid for items or services.

78.     Thus, MSPRC 44 lacks an adequate legal remedy to obtain the requested information, and an accounting is the appropriate remedy.

## JURY TRIAL DEMAND

MSPRC 44 demands a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

WHEREFORE, MSPRC 44 seeks a judgment granting the following relief:

i.      a judgment awarding reimbursement of double damages for those amounts to which MSPRC 44 is entitled under 42 U.S.C. § 1395y(b)(3)(A), as alleged in Count I;

ii.     a judgment ordering an accounting of all instances where IDS settled under a third-party insurance policy or accepted coverage under a first party insurance policy, including the identity of each claimant or claimants, or if known to IDS, claimants for whose benefit HEAL provided or paid for items or services;

iii.    a judgment awarding MSPRC 44 pre-judgment and post-judgment interest consistent with the statute; and

iv.     a judgment awarding MSPRC 44 such other and further relief as the Court deems just and proper under the circumstances.

18

Dated: October 20, 2022

/s/Charles J. Crueger
Charles J. Crueger
CRUEGER DICKINSON, LLC
4532 N. Oakland
Whitefish Bay, WI 53211
Tel: (414) 210-3900
Email: cjc@cruegerdickinson.com

Natalie M. Rico (admission application forthcoming)
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
Attorneys for Plaintiff
2701 S. LeJeune Road, 10th Floor
Miami, FL 33134
Tel.: (866) 252-0878
Fax: (919) 600-5035
Primary Emails: Nrico@milberg.com
Secondary Email: Amkamanga@milberg.com

Karl J. Amelchenko (admission application forthcoming)
MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN, PLLC
900 West Morgan Street
Raleigh, NC 27603
Tel: (919) 600-5000
Fax: (919) 600-5035
Email: kamelchenko@milberg.com

*Attorneys for Plaintiff*

<u>**APPENDIX**</u>

**CMS' Standard for Storing Digital Health Insurance Claims Data**

1.      It is the custom and practice of CMS and Primary Payers to maintain records in a detailed electronic format. According to the U.S. Department of Health and Human Services (HHS), CMS, federal statutes, and industry best practices and guidelines, the standard format for storing digital health insurance claims data is an electronic data interchange ("EDI") format called 837P ("837").

      a.    The 837 standard is mandated by the federal government and used federal and state payors such as Medicare and Medicaid.

      b.    The 837 standard is also used by private insurers, hospitals, clinics, physicians and other health care providers (i.e., HIPAA covered entities) who typically adopt CMS standards.

      c.    Paper claims are captured in the CMS 1500, UB04, and UB92 forms, but electronically, the standard for storing data is the 837 format.

2.      Essential components of an 837-claim file include but are not limited to the date(s) of service, diagnosis code(s) and medical procedure code(s).

      a.    <u>Dates (including dates of service)</u>: the standard format for dates in electronic health care claims is YYYYMMDD, CCYYMMDD, or MM/DD/YYYY.

          i.    According to industry best practices and guidelines, and HHS and CMS, the standard format for expressing dates in healthcare insurance claims data is CCYYMMDD (CC representing two numeric digits to indicate Century, YY representing two numeric digits for year, MM representing two digits for the month, and DD representing two digits for the day of the month).

Sometimes this is alternately expressed as YYYYMMDD. [1]

    ii.   The CCYYMMDD date format standard has been in place for many years. *See* CMS Guidance for 2010[1], 2011[2], 2012[3], 2013[4], 2014[5], and 2016.[6]

    iii.   CMS has also accepted the MM/DD/YYYY format for its local coverage

---

[1] *See* the Medicare Claims Processing Manual Chapter 3 and CMS Manual System, Pub 100-08 Medicare Program Integrity, Transmittal 721.

[1] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 761 (Aug. 20, 2010), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R761OTN.pdf.

[2] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 988 (Oct. 28, 2011), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R988OTN.pdf.

[3] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 1050 (Feb. 29, 2012), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1050OTN-.pdf.

[4] CMS Manual System, Pub 100-20 One-Time Notification, Transmittal 1277 (Aug. 9, 2013), *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R1277OTN.pdf.

[5] Memorandum from Tracey McCutcheon, Acting Director, Medicare Drug Benefit and C & D Data Group, and Laurence Wilson, Director, Chronic Care Policy Group, to All Part D Plan Sponsors and Medicare Hospice Providers (Mar. 10, 2014) (on file with author), *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/Hospice/Downloads/Part-D-Payment-Hospice-Final-2014-Guidance.pdf.

[6] Memorandum from Cheri Rice, Director, Medicare Plan Payment Group, and Cathy Carter, Director, Enterprise Systems Solutions Group, to All Medicare Advantage, Prescription Drug Plan, Cost, PACE, and Demonstration Organizations Systems Staff (Nov. 9, 2016) (on file with author), *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/CMS-Information-Technology/mapdhelpdesk/Downloads/Announcement-of-the-February-2017-Software-Release.pdf.

determination data.[7]

    iv.   The purpose of the date format is to ensure that dates of health care claims such as the date a medical procedure was provided (date of service or "DOS") in comparison to the date of settlement, can be searched, sorted and properly selected as compensable or non-compensable claims.

    v.   In general, ensuring the accuracy of dates, and other data is essential to analyzing claims data files by health insurers and others who may need to determine the value of claims, the relevance of particular claims with respect to patient conditions, dates of care, or whether the claim is compensable.

   b.  <u>Medical Diagnosis and Procedure Codes</u>:

    i.   Diagnosis-Related Group (DRG) – DRGs are a statistical system of classifying any inpatient stay into groups for the purposes of payment. The DRG classification system divides possible diagnoses into more than 20 major body systems and subdivides them into almost 500 groups for the purpose of Medicare reimbursement. Factors used to determine the DRG payment amount include the diagnosis involved as well as the hospital

---

[7] Local Coverage Determination (LCD) Date of Service Criteria, *available at* https://www.cms.gov/medicare-coverage-database/search/lcd-date-search.aspx?DocID=L35093&bc=gAAAAAAAAAAAA.

resources necessary to treat the condition.[89]

    ii.   International Classification of Diseases (ICD-9 and ICD-10) – Hospitals report diagnosis information using codes from the ICD-9-CM (the International Classification of Diseases, 9th Edition, Clinical Modification if the date of service is before October 1, 2015) or ICD-10 CM (if the date of service is on or after October 1, 2015).

    iii.   Inpatient medical procedures ICD-9 Volume 2 and Volume 3 and ICD-10 PCS – These codes are used to describe inpatient medical procedures, excluding the physician's bill.

    iv.   Current Procedural Terminology ("CPT") – CPT[10] codes are a standardized listing of descriptive terms and identifying codes for reporting outpatient medical services and procedures as well as both inpatient and outpatient physician services. The current version, CPT-4, is maintained by the American Medical Association and is an accepted standard by the National

---

[8] Gillian I. Russell, Terminology, in FUNDAMENTALS OF HEALTH LAW 1, 12 (American Health Lawyers Association 5th ed., 2011).

[9] Beginning in 2007, CMS overhauled the DRG system with the development of "severity-adjusted DRGs" and began to replace DRGs with "Medicare-severity DRGs" or "MS-DRGs" through a three-year phase-in period that blended payment under the old DRG system and the MS-DRG system. In a small number of MS-DRGs, classification is also based on the age, gender, and discharge status of the patient. The diagnosis and discharge information is reported by the hospital using codes from the ICD-9-CM or ICD-10-CM if the date of service is on or after October 1, 2015.

[10] CPT codes and descriptions are copyrights of the American Medical Association Current Procedural Terminology.

Committee on Vital Statistics or NCVHS.[11]

    v.   Ambulatory Patient Classification (APC) – Services performed in outpatient ambulatory surgery centers may be classified by APCs. CMS assigns individual services to APCs based on similar clinical characteristics and similar costs.[12]

    vi.   Healthcare Common Procedure Coding System (HCPCS) – HCPCS is mainly used to indicate medical supplies, durable medical goods, ambulance services, and durable medical equipment, prosthetics, orthotics and supplies (DMEPOS).[13]

    vii.   Medical Data Code Sets – The standard Code set for medical diagnosis and procedure codes in health care claims is a series of digits as specified in 45 C.F.R. § 162.1002.

    viii.   The purpose of standard diagnosis code sets is to use a universal terminology in describing patients with certain conditions to determine compensable or non-compensable claims.

---

[11] National Committee on Vital and Health Statistics, Consolidated Health Informatics Initiative, *available at* http://www.ncvhs.hhs.gov/meeting-calendar/agenda-of-the-december-9-10-2003-ncvhs-subcommittee-on-standards-and-security-hearing/consolidated-health-informatics-initiative-final-recommendation-information-sheet-billingfinancial-for-the-december-9-2003-ncvhs-subcommittee-on-standards-and-security-hearing/.

[12] CMS, Hospital Outpatient Prospective Payment System, Partial Hospitalization services furnished by hospitals or Community Mental Health Centers, Ambulatory Payment System, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/HospitalOutpaysysfctsht.pdf.

[13] American Academy of Professional Coders (AAPC), https://www.aapc.com/resources/medical-coding/hcpcs.aspx.

ix. CMS primarily utilizes two systems of classification: (1) International Classification of Diseases ("ICD-9" and "ICD-10") medical diagnosis codes; and (2) Current Procedural Terminology ("CPT-4") procedure codes. *See* 45 C.F.R. § 162.1002.